**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VIRGIN ORBIT, LLC,[1] | ) | Case No. 23-10408 (KBO) |
| | ) | |
| Debtor. | ) | **Related to Docket No. 17** |
| | ) | |

### MEMORANDUM ORDER

On July 31, 2023, the Court entered the *Order Confirming The Fifth Amended Joint Chapter 11 Plan Of Virgin Orbit Holdings, Inc. And Its Debtor Affiliates* (the "Confirmation Order"),[2] which confirmed the *Fifth Amended Joint Chapter 11 Plan Of Virgin Orbit Holdings, Inc. And Its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code* (the "Plan").[3] Thereafter, Dr. Tamas Hampel ("Dr. Hampel"), who had held equity in debtor Virgin Orbit Holdings Inc., sought to revoke the Confirmation Order pursuant to 11 U.S.C. § 1144.[4] Having considered the argument and evidence put forth by the parties as well as the record of these cases, the Court finds and orders as follows:

**I.    RELEVANT FACTS**

Prior to their bankruptcy filings, Virgin Orbit Holdings, Inc., Virgin Orbit National Systems, LLC, Vieco USA, Inc., Virgin Orbit, LLC, and JACM Holdings, Inc. (collectively, the "Debtors") provided satellite launch services to domestic and international commercial and government customers.[5] After unsuccessfully marketing the company for sale in 2022, the Debtors filed for chapter 11 bankruptcy protection in early April 2023 facing an immediate liquidity crisis. They entered bankruptcy with the objective of maximizing value for all stakeholders through an expedited sale of substantially all of their assets pursuant to section 363.[6]

The Debtors sought and obtained at an uncontested hearing an order approving, among other things, certain bidding procedures, an auction date, a sale hearing, and the form and manner

---

[1] The debtor in this case, along with the last four digits of the debtor's federal tax identification number, is: Virgin Orbit, LLC (9648). The debtor's mailing address for purposes of this case is 251 Little Falls Drive, Wilmington, DE 19808. The chapter 11 cases of the debtor's affiliates, Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit Holdings, Inc. (6914); and JACM Holdings, Inc. (1445), were closed as of December 1, 2023. All motions and contested matters that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Virgin Orbit, LLC.

[2] D.I. 604. All docket references herein are to case number 23-10405 unless otherwise indicated.

[3] *See id.*, Exh. A.

[4] Case No. 23-10408, D.I. 17.

[5] *See generally* D.I. 13.

[6] *Id.* All statutory references herein are to the Bankruptcy Code.

of notice thereof (the "Bid Procedures Order").[7] In entering the Bid Procedures Order, the Court determined that the bidding procedures were in the best interest of the estates, fair, reasonable, appropriate, and reasonably designed to maximize value.[8] The Court also found that the form and manner of the sale notice were appropriate, sufficient, and reasonably calculated to provide proper notice of the auction, sale hearing, and the bidding procedures.[9]

The Debtors thereafter obtained approval to designate a non-insider stalking horse purchaser (the "Stalking Horse") for certain key assets.[10] In support of the designation, a representative of the Debtors' investment banker, Ducera Partners LLC ("Ducera"), explained that Ducera had contacted 204 potential strategic and financial bidders for the Debtors' assets. In doing so, it solicited offers for both a going-concern sale and piecemeal asset sales.[11] All interested parties that executed non-disclosure agreements were given a confidential information memorandum containing an overview of the Debtors' business, access to a virtual data room, and where appropriate, access to Debtors' management team, operational personnel, and facilities.[12] The Debtors received over 30 indications of interest, including from multiple parties that proposed continuing to operate the business as a going concern.[13] Ultimately, the Debtors and their advisors determined that selecting the Stalking Horse's bid to establish a floor price for the subject assets in anticipation of the future auction would maximize recoveries for all stakeholders and was in the best interests of the Debtors.[14]

After securing their Stalking Horse, the Debtors and their advisors continued the marketing and sales process in accordance with the Bid Procedures Order, freely able to deal with anyone interested in acquiring their assets. Ducera contacted even more possible bidders, bringing the total to 209.[15] Based upon the bids received, the Debtors exercised their business judgment in consultation with, among others, the Official Committee of Unsecured Creditors (the "Committee"), to conclude that it would be beneficial to sell their assets in five distinct groups.[16] They auctioned those groups and declared four non-insider winning bidders, each for a distinct group of assets.[17] The fifth asset group was not sold at the auction.

---

[7] D.I. 201, 212.

[8] D.I. 201 at 3-4.

[9] *Id.*

[10] D.I. 326.

[11] D.I. 275 ¶¶ 8-11.

[12] *Id.* ¶ 9.

[13] *Id.* ¶ 10.

[14] *Id.* ¶¶ 16-18.

[15] *See, e.g.*, D.I. 340 ¶ 9.

[16] *See, e.g., id.* ¶ 21.

[17] *See, e.g., id.* One of these bidders was deemed a provisional successful bidder subject to finalization of definitive documentation. *See, e.g., id.* ¶ 22 n.4.

2

The Court then conducted an evidentiary sale hearing. Evidence was submitted from Ducera and the Debtors' Chief Executive Officer as to the marketing of the Debtors' assets, the competitive bidding process, the auction, the value of the winning bids, and the good faith, non-collusive behavior of the Debtors and the purchasers.[18] The Court approved the four sales.[19] Thereafter, the Debtors selected a non-insider purchaser for the fifth and final group of assets.[20] Similar evidence was submitted in support of this sale,[21] and the Court approved it.[22] In entering the five sale orders (together, the "Sale Orders"), the Court ruled that, among other things, the notice of the Bid Procedures Order, sale, auction, objection deadline, and sale hearing was sufficiently provided to all interested parties, the Debtors acted in compliance with the Bid Procedures Order, entering into the sales constituted a valid and sound exercise of the Debtors' business judgment, the Debtors and purchasers acted in good faith, and the consideration provided by the purchasers was the highest and best offers for the purchased assets.[23]

The Debtors did not generate enough from the sales to repay their post-petition debtor-in-possession financing obligations (the "DIP Claim") to Virgin Investments Limited ("VIL"), which was also the Debtors' indirect parent and prepetition senior secured lender. Notwithstanding, a global settlement was reached among the Debtors, the Committee, and VIL that allowed the Debtors to propose a plan to satisfy administrative expense and other priority claims and provide a small distribution to holders of allowed general unsecured creditors despite VIL receiving significantly less than full repayment on its senior secured claims.

The Plan classifies the Debtors' claims and interests into nine classes.[24] Particularly relevant to this dispute are Classes 3-5 and 9. Class 3 consists of the pre-petition secured claim held by VIL. Classes 4 and 5 contain general unsecured claims. Class 9 contains equity interests like those held by Dr. Hampel.

As to treatment of these claims and interests, the Plan allowed VIL's Class 3 claim in the principal amount of $28,400,000. It distributed to VIL in satisfaction of this claim and the DIP Claim cash, interests in a post-confirmation litigation trust, and all intellectual property assets owned by the Debtors that were not sold in the section 363 sale process (the "Remaining IP Assets").[25] The Debtors projected and disclosed that VIL would ultimately recover less than half of its DIP Claim and nothing on the prepetition secured claim.[26] Despite this meager recovery,

---

[18] *See, e.g.*, D.I. 340, 348, 369, 370.

[19] D.I. 364, 365, 378, 379.

[20] D.I. 455. This purchaser participated in the auction but did not submit an acceptable bid. The Debtors continued negotiations with several parties following the auction and ultimately selected the purchaser as the successful bidder. *See generally* D.I. 454.

[21] D.I. 454, 455.

[22] D.I. 481.

[23] *See generally* D.I. 364, 365, 378, 379, 481.

[24] D.I. 604, Exh. A, Art. III.

[25] The Remaining IP Assets included the Debtors' rocket engine and rocket avionics system intellectual property.

[26] D.I. 465, 574.

3

VIL waived its resulting unsecured deficiency claim, which increased recoveries for general unsecured creditors.

Under the Plan, holders of Class 4 general unsecured claims received their pro rata share of a cash pool in an amount no less than $1,100,000, certain other cash, and interests in the post-confirmation trust. The projected recovery for this class is, at best, 1.29% to 5.46% of the claims.[27] Class 5 general unsecured creditors held "convenience claims" in an amount of $5,000 or less and received a higher percentage distribution but less than full repayment. Equity interests in Class 9 were canceled and extinguished.

Classes 3-5 were entitled to vote on the Plan. Classes 4 and 5 accepted, and Class 3 did not vote.[28] The Court then conducted a confirmation hearing. At the time of the hearing, the Plan was contested in part, but the outstanding objections did not touch on issues regarding the treatment of claims and interests, asset valuation, or the Debtors' good faith in proposing the Plan.[29] In fact, the Equity Holders (as defined herein) did not object to the Plan. After the objections were addressed through either agreements reached by the parties or rulings of the Court, the Court confirmed the Plan and subsequently entered the Confirmation Order.[30] In doing so, the Court found and concluded that, among other things, notice of the confirmation hearing was appropriate, the global settlement as incorporated and implemented by the Plan was fair, equitable, reasonable, and in the best interest of the Debtors and their estates, the Plan complied with all applicable provisions of section 1129, and the Plan was proposed in good faith and not by means forbidden by law.[31] The Plan went effective two days after the Confirmation Order was entered.[32] The Confirmation Order was not appealed and is final.

Approximately five months after entry of the Confirmation Order, Dr. Hampel filed a submission that the Court deemed a motion pursuant to section 1144 to revoke the Confirmation Order (the "Motion").[33] Seven other equity holders joined Dr. Hampel's Motion.[34] The Court will collectively refer to Dr. Hampel and the joining equity holders as the "Equity Holders." In accordance with the Court's *Scheduling Order*,[35] Dr. Hampel timely filed further submissions in

---

[27] *Id.*

[28] D.I. 572. Class 9 was deemed to have rejected the Plan pursuant to section 1126(g).

[29] D.I. 606. Two equity holders filed an objection seeking issuance of equity in the reorganized Debtors, but they withdrew the objection prior to the confirmation hearing. *See* D.I. 587, 590, 606.

[30] D.I. 604.

[31] *Id.*

[32] D.I. 610.

[33] Case No. 23-10408, D.I. 17-18.

[34] See docket item number 47 filed in case number 23-10408 attaching the written statements of Aydin Karahan, Chin Ho William Lee, Katalin Sebestyen, Iryna Karahan, Eric W. Fischbach, and Lubos Hhna. A seventh equity holder, Stephen Inguagiato, attended the hearing and joined Dr. Hampel. Mr. Inguagiato made a brief argument in support of his belief of the Debtors' significant value.

[35] Case No. 23-10408, D.I. 18.

support of his Motion,[36] the Debtors responded,[37] and the Court held an evidentiary hearing to consider the contested matter.[38]

## II.   LEGAL DISCUSSION

The Equity Holders' request for revocation of the Confirmation Order rests upon an overarching belief that the Debtors' assets were worth approximately $3.7 billion as a going concern but were improperly marketed and sold in piece-meal fashion during bankruptcy "fire sales." This unfair sale process then allowed the Debtors to misrepresent the value of the Remaining IP Assets so that they were distributed to VIL at the expense of other creditors and interest holders. The Equity Holders posit that this deliberate lack of honesty and transparency amounts to fraud and led to the unlawful cancellation of their equity interests. They urge revocation of the Confirmation Order so that the Court can remedy the alleged unjust treatment they experienced and restore the integrity of the bankruptcy process.

As a threshold matter, any arguments that the Debtors did not undertake a fair and proper marketing and sales process and did not sell assets for appropriate value are barred by *res judicata*. *Res judicata* is a judicial doctrine that precludes parties from relitigating claims that could have been raised or litigated in an earlier action.[39] *Res judicata* "requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action."[40] The Equity Holders' challenges and critiques of the sales go to the heart of the findings and conclusions this Court made when entering the Bid Procedures Order and Sales Orders.[41] The orders were not appealed and are final.[42] The Equity Holders had the opportunity to object and be heard at the bidding procedures and sale hearings as parties in interest.[43] They did not object or participate. Accordingly, they are bound by the results.

---

[36] *Id.*, D.I. 19, 25.

[37] *Id.*, D.I. 30.

[38] A request to revoke an order confirming a chapter 11 plan must be brought by adversary proceeding. *See* FED. R. BANKR. P. 7001(5). The Reorganized Debtors do not contest the procedural mechanism by which Dr. Hampel pursues revocation, and this Court declines to deny the relief sought on this ground. *See, e.g., Kauffman v. Moss*, 420 F.2d 1270, 1276 (3d Cir. 1970) (declining to dismiss a *pro se* civil rights complaint, explaining "litigation, where possible, should be decided on the merits.").

[39] *See Bd. of Tr. of Trucking Emp. of N.J. Welfare Fund, Inc.-Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992).

[40] *Id.*

[41] *See id.* ("Whether two lawsuits are based on the identical cause of action 'turn[s] on the essential similarity of the underlying events giving rise to the various legal claims.' Courts should not apply this conceptual test mechanically, but should focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out the same occurrence in a single suit." (quoting *United States v. Athlone Indus.* 746 F.2d 977, 983 (3d Cir. 1984))).

[42] *See In re Culp*, 550 B.R. 683, 691 (D. Del. 2015) ("The majority of courts to consider the issue have concluded that an order authorizing the sale of assets of an estate is a final, appealable order.").

[43] 11 U.S.C. § 1109(b) ("A party in interest, including . . . an equity security holder . . ., may raise and may appear and be heard on any issue in a case under this chapter.").

Moreover, the pre-confirmation sales are irrelevant to the inquiry that the Court must undertake under section 1144 to determine whether to revoke the Confirmation Order. Section 1144 allows a court to revoke a confirmation order "if and only if such order was procured by fraud."[44] As explained in *In re Melinta Therapeutics, Inc.*,[45] to show that a confirmation order was procured by fraud, a moving party must demonstrate the following five elements:

(1) that the debtor made a representation regarding compliance with Code § 1129 which was materially false;

(2) that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth;

(3) that the representation was made to induce the court to rely upon it;

(4) [that] the court did rely upon it; and

(5) that as a consequence of such reliance, the court entered the confirmation order.[46]

This standard is high to protect the finality of confirmation orders.[47]

The Equity Holders have not succeeded in meeting the high bar set for revocation. Distilled to the simplest terms, the Equity Holders argue that the Debtors were dishonest about the value of the Remaining IP Assets so that VIL could obtain them without equity holders receiving their fair share. They do not identify with precision any alleged false representations regarding the requirements of section 1129 that the Debtors made to obtain confirmation of the Plan. But the sum and substance of their argument minimally challenges statements the Debtors made to support the Plan's compliance with section 1129(a)(3) (that the Plan was proposed in good faith and not by any means forbidden by law), section 1129(a)(7) (that the Plan satisfied the best interests test), and section 1129(b)(1) (that the Plan did not unfairly discriminate, and was fair and equitable, with respect to Class 9).[48]

Notwithstanding the liberties the Court takes on behalf of the Equity Holders' arguments, the Court cannot overlook the fact that they did not submit evidence sufficient to show that the Debtors' statements were materially false. In advocating their position, the Equity Holders point the Court to a series of news articles that report the alleged prepetition value of the Debtors, the

---

[44] *Id.* § 1144.

[45] 623 B.R. 257, 263-64 (Bankr. D. Del. 2020).

[46] *Id.* (alternation in original).

[47] *See, e.g.*, *In re E. W. Resort Dev. V, L.P.*, L.L.L.P., No. 10-10452, 2014 WL 4537500, at **9-10 (Bankr. D. Del. Sept. 12, 2014).

[48] *See generally* D.I. 465, 573, 574, 575.

private and public sector interest in the Debtors' technology and similar technologies, and the Debtors' successful satellite launches. They also point to the Debtors' statements regarding the indications of interest received prior to the auction as well as promotional materials that advertised the value of the Debtors. At the hearing, Dr. Hampel submitted a short promotional video allegedly created by the Debtors prior to the bankruptcy highlighting their anticipated success. This material is not persuasive evidence to prove the value of the Debtors' Remaining IP Assets at the time of confirmation, let alone that such value exceeded the amounts of claims senior to equity interests such that equity holders were entitled to obtain a recovery in these cases.

The value of the Debtors' assets was determined by the marketplace after an open and fair sale process overseen by this Court.[49] This valuation method is the "gold standard."[50] The sales, however, did not yield the value the Debtors and their stakeholders had hoped. No actionable going-concern bids were received, resulting in the segmented sales. Moreover, no actionable bids were received for the Remaining IP Assets and therefore, they were not sold. In total, the value generated from the sales was insufficient to repay the Debtors' debtor-in-possession financing. Notwithstanding, the global settlement reached between estate fiduciaries and VIL allowed the Debtors to confirm a plan that will provide a small distribution to general unsecured creditors despite VIL's senior secured claims not being paid in full. There simply was not enough value in the estates to allow the Debtors' equity holders, who are behind unsecured creditors in the priority scheme, to obtain a recovery. This is an unfortunate, typical result in bankruptcy cases. But it does not support revocation of the Confirmation Order.

### III.   CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that the Motion is denied.

Dated: March 6, 2024
Wilmington, DE

Karen B. Owens
United States Bankruptcy Judge

---

[49] *See e.g.*, *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d Cir. 2006) ("Section 363 attempts to avoid the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price. The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth.").

[50] *Kravitz v. Samson Energy Co., LLC (In re Samson Res. Corp.)*, Adv. Pro. No. 17-51524, 2023 WL 4003815, at *1 (Bankr. D. Del. June 14, 2023) ("It is black letter law in this Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market.").