Official Form 417A (12/23)

RECEIVED

2024 MAR 12  PM 3: 02

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

*[Caption as in Form 416A, 416B, or 416D, as appropriate]*

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1. Name(s) of appellant(s): Dr. Tamas Hampel

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
☐ Plaintiff
☐ Defendant
☐ Other (describe) _____

For appeals in a bankruptcy case and not in an adversary proceeding.
☐ Debtor
☐ Creditor
☐ Trustee
☑ Other (describe) Equity holder _____

### Part 2:  Identify the subject of this appeal

1. Describe the judgment—or the appealable order or decree—from which the appeal is taken:
   Virgin Orbit, LLC (Case No. 23-10408), MEMORANDUM ORDER (related document(s)17), Docket No. 64

2. State the date on which the judgment—or the appealable order or decree—was entered:
   03/06/2024

### Part 3: Identify the other parties to the appeal

List the names of all parties to the judgment—or the appealable order or decree—from which the appeal is taken and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party: _____   Attorney: _____
                                         _____
                                         _____
                                         _____

2. Party: _____   Attorney: _____
                                         _____
                                         _____
                                         _____

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☑ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign below**

_____    Date: 03/07/2024 _____
Signature of attorney for appellant(s) (or appellant(s)
if not represented by an attorney)

Name, address, and telephone number of attorney
(or appellant(s) if not represented by an attorney):
Dr. Tamas Hampel
_____
HUNGARY, 1125 Budapest, Diós árok 49d
_____
Phone: +36203902090, email: tamas.hampel@gmail.com

Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.

**[Note to inmate filers:** If you are an inmate filer in an institution and you seek the timing benefit of Fed. R. Bankr. P. 8002(c)(1), complete Director's Form 4170 (Declaration of Inmate Filing) and file that declaration along with the Notice of Appeal.]

RECEIVED

2024 MAR 12 PM 3: 02

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VIRGIN ORBIT, LLC,[1] | ) | Case No. 23-10408 (KBO) |
| | ) | |
| Debtor. | ) | **Related to Docket No. 17** |
| | ) | |

## <u>MEMORANDUM ORDER</u>

On July 31, 2023, the Court entered the *Order Confirming The Fifth Amended Joint Chapter 11 Plan Of Virgin Orbit Holdings, Inc. And Its Debtor Affiliates* (the "Confirmation Order"),[2] which confirmed the *Fifth Amended Joint Chapter 11 Plan Of Virgin Orbit Holdings, Inc. And Its Debtor Affiliates Under Chapter 11 Of The Bankruptcy Code* (the "Plan").[3] Thereafter, Dr. Tamas Hampel ("Dr. Hampel"), who had held equity in debtor Virgin Orbit Holdings Inc., sought to revoke the Confirmation Order pursuant to 11 U.S.C. § 1144.[4] Having considered the argument and evidence put forth by the parties as well as the record of these cases, the Court finds and orders as follows:

## I.    RELEVANT FACTS

Prior to their bankruptcy filings, Virgin Orbit Holdings, Inc., Virgin Orbit National Systems, LLC, Vieco USA, Inc., Virgin Orbit, LLC, and JACM Holdings, Inc. (collectively, the "Debtors") provided satellite launch services to domestic and international commercial and government customers.[5] After unsuccessfully marketing the company for sale in 2022, the Debtors filed for chapter 11 bankruptcy protection in early April 2023 facing an immediate liquidity crisis. They entered bankruptcy with the objective of maximizing value for all stakeholders through an expedited sale of substantially all of their assets pursuant to section 363.[6]

The Debtors sought and obtained at an uncontested hearing an order approving, among other things, certain bidding procedures, an auction date, a sale hearing, and the form and manner

---

[1] The debtor in this case, along with the last four digits of the debtor's federal tax identification number, is: Virgin Orbit, LLC (9648). The debtor's mailing address for purposes of this case is 251 Little Falls Drive, Wilmington, DE 19808. The chapter 11 cases of the debtor's affiliates, Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit Holdings, Inc. (6914); and JACM Holdings, Inc. (1445), were closed as of December 1, 2023. All motions and contested matters that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Virgin Orbit, LLC.

[2] D.I. 604. All docket references herein are to case number 23-10405 unless otherwise indicated.

[3] *See id.*, Exh. A.

[4] Case No. 23-10408, D.I. 17.

[5] *See generally* D.I. 13.

[6] *Id.* All statutory references herein are to the Bankruptcy Code.

of notice thereof (the "Bid Procedures Order").[7]  In entering the Bid Procedures Order, the Court determined that the bidding procedures were in the best interest of the estates, fair, reasonable, appropriate, and reasonably designed to maximize value.[8]  The Court also found that the form and manner of the sale notice were appropriate, sufficient, and reasonably calculated to provide proper notice of the auction, sale hearing, and the bidding procedures.[9]

The Debtors thereafter obtained approval to designate a non-insider stalking horse purchaser (the "Stalking Horse") for certain key assets.[10]  In support of the designation, a representative of the Debtors' investment banker, Ducera Partners LLC ("Ducera"), explained that Ducera had contacted 204 potential strategic and financial bidders for the Debtors' assets.  In doing so, it solicited offers for both a going-concern sale and piecemeal asset sales.[11]  All interested parties that executed non-disclosure agreements were given a confidential information memorandum containing an overview of the Debtors' business, access to a virtual data room, and where appropriate, access to Debtors' management team, operational personnel, and facilities.[12]  The Debtors received over 30 indications of interest, including from multiple parties that proposed continuing to operate the business as a going concern.[13]  Ultimately, the Debtors and their advisors determined that selecting the Stalking Horse's bid to establish a floor price for the subject assets in anticipation of the future auction would maximize recoveries for all stakeholders and was in the best interests of the Debtors.[14]

After securing their Stalking Horse, the Debtors and their advisors continued the marketing and sales process in accordance with the Bid Procedures Order, freely able to deal with anyone interested in acquiring their assets.  Ducera contacted even more possible bidders, bringing the total to 209.[15]  Based upon the bids received, the Debtors exercised their business judgment in consultation with, among others, the Official Committee of Unsecured Creditors (the "Committee"), to conclude that it would be beneficial to sell their assets in five distinct groups.[16]  They auctioned those groups and declared four non-insider winning bidders, each for a distinct group of assets.[17]  The fifth asset group was not sold at the auction.

---

[7] D.I. 201, 212.

[8] D.I. 201 at 3-4.

[9] Id.

[10] D.I. 326.

[11] D.I. 275 ¶¶ 8-11.

[12] Id. ¶ 9.

[13] Id. ¶ 10.

[14] Id. ¶¶ 16-18.

[15] See, e.g., D.I. 340 ¶ 9.

[16] See, e.g., id. ¶ 21.

[17] See, e.g., id.  One of these bidders was deemed a provisional successful bidder subject to finalization of definitive documentation.  See, e.g., id. ¶ 22 n.4.

The Court then conducted an evidentiary sale hearing.  Evidence was submitted from Ducera and the Debtors' Chief Executive Officer as to the marketing of the Debtors' assets, the competitive bidding process, the auction, the value of the winning bids, and the good faith, non-collusive behavior of the Debtors and the purchasers.[18]  The Court approved the four sales.[19]  Thereafter, the Debtors selected a non-insider purchaser for the fifth and final group of assets.[20]  Similar evidence was submitted in support of this sale,[21] and the Court approved it.[22]  In entering the five sale orders (together, the "Sale Orders"), the Court ruled that, among other things, the notice of the Bid Procedures Order, sale, auction, objection deadline, and sale hearing was sufficiently provided to all interested parties, the Debtors acted in compliance with the Bid Procedures Order, entering into the sales constituted a valid and sound exercise of the Debtors' business judgment, the Debtors and purchasers acted in good faith, and the consideration provided by the purchasers was the highest and best offers for the purchased assets.[23]

The Debtors did not generate enough from the sales to repay their post-petition debtor-in-possession financing obligations (the "DIP Claim") to Virgin Investments Limited ("VIL"), which was also the Debtors' indirect parent and prepetition senior secured lender.  Notwithstanding, a global settlement was reached among the Debtors, the Committee, and VIL that allowed the Debtors to propose a plan to satisfy administrative expense and other priority claims and provide a small distribution to holders of allowed general unsecured creditors despite VIL receiving significantly less than full repayment on its senior secured claims.

The Plan classifies the Debtors' claims and interests into nine classes.[24]  Particularly relevant to this dispute are Classes 3-5 and 9.  Class 3 consists of the pre-petition secured claim held by VIL.  Classes 4 and 5 contain general unsecured claims.  Class 9 contains equity interests like those held by Dr. Hampel.

As to treatment of these claims and interests, the Plan allowed VIL's Class 3 claim in the principal amount of $28,400,000.  It distributed to VIL in satisfaction of this claim and the DIP Claim cash, interests in a post-confirmation litigation trust, and all intellectual property assets owned by the Debtors that were not sold in the section 363 sale process (the "Remaining IP Assets").[25]  The Debtors projected and disclosed that VIL would ultimately recover less than half of its DIP Claim and nothing on the prepetition secured claim.[26]  Despite this meager recovery,

---

[18] *See, e.g.*, D.I. 340, 348, 369, 370.

[19] D.I. 364, 365, 378, 379.

[20] D.I. 455.  This purchaser participated in the auction but did not submit an acceptable bid.  The Debtors continued negotiations with several parties following the auction and ultimately selected the purchaser as the successful bidder.  *See generally* D.I. 454.

[21] D.I. 454, 455.

[22] D.I. 481.

[23] *See generally* D.I. 364, 365, 378, 379, 481.

[24] D.I. 604, Exh. A, Art. III.

[25] The Remaining IP Assets included the Debtors' rocket engine and rocket avionics system intellectual property.

[26] D.I. 465, 574.

VIL waived its resulting unsecured deficiency claim, which increased recoveries for general unsecured creditors.

Under the Plan, holders of Class 4 general unsecured claims received their pro rata share of a cash pool in an amount no less than $1,100,000, certain other cash, and interests in the post-confirmation trust. The projected recovery for this class is, at best, 1.29% to 5.46% of the claims.[27] Class 5 general unsecured creditors held "convenience claims" in an amount of $5,000 or less and received a higher percentage distribution but less than full repayment. Equity interests in Class 9 were canceled and extinguished.

Classes 3-5 were entitled to vote on the Plan. Classes 4 and 5 accepted, and Class 3 did not vote.[28] The Court then conducted a confirmation hearing. At the time of the hearing, the Plan was contested in part, but the outstanding objections did not touch on issues regarding the treatment of claims and interests, asset valuation, or the Debtors' good faith in proposing the Plan.[29] In fact, the Equity Holders (as defined herein) did not object to the Plan. After the objections were addressed through either agreements reached by the parties or rulings of the Court, the Court confirmed the Plan and subsequently entered the Confirmation Order.[30] In doing so, the Court found and concluded that, among other things, notice of the confirmation hearing was appropriate, the global settlement as incorporated and implemented by the Plan was fair, equitable, reasonable, and in the best interest of the Debtors and their estates, the Plan complied with all applicable provisions of section 1129, and the Plan was proposed in good faith and not by means forbidden by law.[31] The Plan went effective two days after the Confirmation Order was entered.[32] The Confirmation Order was not appealed and is final.

Approximately five months after entry of the Confirmation Order, Dr. Hampel filed a submission that the Court deemed a motion pursuant to section 1144 to revoke the Confirmation Order (the "Motion").[33] Seven other equity holders joined Dr. Hampel's Motion.[34] The Court will collectively refer to Dr. Hampel and the joining equity holders as the "Equity Holders." In accordance with the Court's *Scheduling Order*,[35] Dr. Hampel timely filed further submissions in

---

[27] *Id.*

[28] D.I. 572. Class 9 was deemed to have rejected the Plan pursuant to section 1126(g).

[29] D.I. 606. Two equity holders filed an objection seeking issuance of equity in the reorganized Debtors, but they withdrew the objection prior to the confirmation hearing. *See* D.I. 587, 590, 606.

[30] D.I. 604.

[31] *Id.*

[32] D.I. 610.

[33] Case No. 23-10408, D.I. 17-18.

[34] See docket item number 47 filed in case number 23-10408 attaching the written statements of Aydin Karahan, Chin Ho William Lee, Katalin Sebestyen, Iryna Karahan, Eric W. Fischbach, and Lubos Hhna. A seventh equity holder, Stephen Inguagiato, attended the hearing and joined Dr. Hampel. Mr. Inguagiato made a brief argument in support of his belief of the Debtors' significant value.

[35] Case No. 23-10408, D.I. 18.

support of his Motion,[36] the Debtors responded,[37] and the Court held an evidentiary hearing to consider the contested matter.[38]

## II.    LEGAL DISCUSSION

The Equity Holders' request for revocation of the Confirmation Order rests upon an overarching belief that the Debtors' assets were worth approximately $3.7 billion as a going concern but were improperly marketed and sold in piece-meal fashion during bankruptcy "fire sales." This unfair sale process then allowed the Debtors to misrepresent the value of the Remaining IP Assets so that they were distributed to VIL at the expense of other creditors and interest holders. The Equity Holders posit that this deliberate lack of honesty and transparency amounts to fraud and led to the unlawful cancellation of their equity interests. They urge revocation of the Confirmation Order so that the Court can remedy the alleged unjust treatment they experienced and restore the integrity of the bankruptcy process.

As a threshold matter, any arguments that the Debtors did not undertake a fair and proper marketing and sales process and did not sell assets for appropriate value are barred by *res judicata*. *Res judicata* is a judicial doctrine that precludes parties from relitigating claims that could have been raised or litigated in an earlier action.[39] *Res judicata* "requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action."[40] The Equity Holders' challenges and critiques of the sales go to the heart of the findings and conclusions this Court made when entering the Bid Procedures Order and Sales Orders.[41] The orders were not appealed and are final.[42] The Equity Holders had the opportunity to object and be heard at the bidding procedures and sale hearings as parties in interest.[43] They did not object or participate. Accordingly, they are bound by the results.

---

[36] *Id.*, D.I. 19, 25.

[37] *Id.*, D.I. 30.

[38] A request to revoke an order confirming a chapter 11 plan must be brought by adversary proceeding. *See* FED. R. BANKR. P. 7001(5). The Reorganized Debtors do not contest the procedural mechanism by which Dr. Hampel pursues revocation, and this Court declines to deny the relief sought on this ground. *See, e.g., Kauffman v. Moss*, 420 F.2d 1270, 1276 (3d Cir. 1970) (declining to dismiss a *pro se* civil rights complaint, explaining "litigation, where possible, should be decided on the merits.").

[39] *See Bd. of Tr. of Trucking Emp. of N.J. Welfare Fund, Inc.-Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992).

[40] *Id.*

[41] *See id.* ("Whether two lawsuits are based on the identical cause of action 'turn[s] on the essential similarity of the underlying events giving rise to the various legal claims.' Courts should not apply this conceptual test mechanically, but should focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out the same occurrence in a single suit." (quoting *United States v. Athlone Indus.* 746 F.2d 977, 983 (3d Cir. 1984))).

[42] *See In re Culp*, 550 B.R. 683, 691 (D. Del. 2015) ("The majority of courts to consider the issue have concluded that an order authorizing the sale of assets of an estate is a final, appealable order.").

[43] 11 U.S.C. § 1109(b) ("A party in interest, including . . . an equity security holder . . ., may raise and may appear and be heard on any issue in a case under this chapter.").

Moreover, the pre-confirmation sales are irrelevant to the inquiry that the Court must undertake under section 1144 to determine whether to revoke the Confirmation Order. Section 1144 allows a court to revoke a confirmation order "if and only if such order was procured by fraud."[44] As explained in *In re Melinta Therapeutics, Inc.*,[45] to show that a confirmation order was procured by fraud, a moving party must demonstrate the following five elements:

(1)     that the debtor made a representation regarding compliance with Code § 1129 which was materially false;

(2)     that the representation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth;

(3)     that the representation was made to induce the court to rely upon it;

(4)     [that] the court did rely upon it; and

(5)     that as a consequence of such reliance, the court entered the confirmation order.[46]

This standard is high to protect the finality of confirmation orders.[47]

The Equity Holders have not succeeded in meeting the high bar set for revocation. Distilled to the simplest terms, the Equity Holders argue that the Debtors were dishonest about the value of the Remaining IP Assets so that VIL could obtain them without equity holders receiving their fair share. They do not identify with precision any alleged false representations regarding the requirements of section 1129 that the Debtors made to obtain confirmation of the Plan. But the sum and substance of their argument minimally challenges statements the Debtors made to support the Plan's compliance with section 1129(a)(3) (that the Plan was proposed in good faith and not by any means forbidden by law), section 1129(a)(7) (that the Plan satisfied the best interests test), and section 1129(b)(1) (that the Plan did not unfairly discriminate, and was fair and equitable, with respect to Class 9).[48]

Notwithstanding the liberties the Court takes on behalf of the Equity Holders' arguments, the Court cannot overlook the fact that they did not submit evidence sufficient to show that the Debtors' statements were materially false. In advocating their position, the Equity Holders point the Court to a series of news articles that report the alleged prepetition value of the Debtors, the

---

[44] *Id.* § 1144.

[45] 623 B.R. 257, 263-64 (Bankr. D. Del. 2020).

[46] *Id.* (alternation in original).

[47] *See, e.g., In re E. W. Resort Dev. V, L.P.*, L.L.L.P., No. 10-10452, 2014 WL 4537500, at **9-10 (Bankr. D. Del. Sept. 12, 2014).

[48] *See generally* D.I. 465, 573, 574, 575.

private and public sector interest in the Debtors' technology and similar technologies, and the Debtors' successful satellite launches. They also point to the Debtors' statements regarding the indications of interest received prior to the auction as well as promotional materials that advertised the value of the Debtors. At the hearing, Dr. Hampel submitted a short promotional video allegedly created by the Debtors prior to the bankruptcy highlighting their anticipated success. This material is not persuasive evidence to prove the value of the Debtors' Remaining IP Assets at the time of confirmation, let alone that such value exceeded the amounts of claims senior to equity interests such that equity holders were entitled to obtain a recovery in these cases.

The value of the Debtors' assets was determined by the marketplace after an open and fair sale process overseen by this Court.[49] This valuation method is the "gold standard."[50] The sales, however, did not yield the value the Debtors and their stakeholders had hoped. No actionable going-concern bids were received, resulting in the segmented sales. Moreover, no actionable bids were received for the Remaining IP Assets and therefore, they were not sold. In total, the value generated from the sales was insufficient to repay the Debtors' debtor-in-possession financing. Notwithstanding, the global settlement reached between estate fiduciaries and VIL allowed the Debtors to confirm a plan that will provide a small distribution to general unsecured creditors despite VIL's senior secured claims not being paid in full. There simply was not enough value in the estates to allow the Debtors' equity holders, who are behind unsecured creditors in the priority scheme, to obtain a recovery. This is an unfortunate, typical result in bankruptcy cases. But it does not support revocation of the Confirmation Order.

## III.    CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** that the Motion is denied.

Dated: March 6, 2024
Wilmington, DE

*[signature]*

Karen B. Owens
**United States Bankruptcy Judge**

---

[49] See e.g., *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d Cir. 2006) ("Section 363 attempts to avoid the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price. The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth.").

[50] *Kravitz v. Samson Energy Co., LLC (In re Samson Res. Corp.)*, Adv. Pro. No. 17-51524, 2023 WL 4003815, at *1 (Bankr. D. Del. June 14, 2023) ("It is black letter law in this Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market.").

## IN THE UNITED STATES COURT FOR THE DISTRICT OF DELAWARE

DR. TAMAS HAMPEL )
)
vs. )    Chapter 11
)
VIRGIN ORBIT, LLC,[1] )    Case No. 23-10408 (KBO)
)
Debtor. )    **Related to Docket No. 64**
)

## APPELLATE BRIEF

Appellant's Brief Challenging Memorandum Order in Case No. 23-10408 (KBO), related to the Memorandum Order under Docket No. 64, before the United States Bankruptcy Court for the District of Delaware

by:

dr. Tamas Hampel
Hungary, 1125 Budapest Dios arok 49d
tamas.hampel@gmail.com
(36) 20 390-2090

Filed in:

---

[1] The debtor in this case, along with the last four digits of the debtor's federal tax identification number, is: Virgin Orbit, LLC (9648). The debtor's mailing address for purposes of this case is 251 Little Falls Drive, Wilmington, DE 19808. The chapter 11 cases of the debtor's affiliates, Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit Holdings, Inc. (6914); and JACM Holdings, Inc. (1445), were closed as of December 1, 2023. All motions and contested matters that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Virgin Orbit, LLC.

1

**TABLE OF CONTENT**

IN THE UNITED STATES COURT FOR THE DISTRICT OF DELAWARE ............................................... 1

AUTHORITIES PRINCIPALLY RELIED UPON ........................................................................................ 3

JURISDICTIONAL STATEMENT ............................................................................................................. 4

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................................................... 5

STANDARD OF REVIEW ........................................................................................................................... 7

ARGUMENTS ............................................................................................................................................... 8

1.  ARGUMENT REGARDING THE NON-APPLICATION OF RES JUDICATA TO THE NON-SALE OF INTELLECTUAL PROPERTY ASSETS ........................................................................................... 8

2.  ARGUMENT REGARDING THE EXCLUSION OF EQUITY HOLDERS FROM THE BANKRUPTCY PROCEEDINGS ............................................................................................................. 9

3.  RESPONSE TO THE COURT'S CONCERN REGARDING THE INSUFFICIENCY OF EVIDENCE 9

4.  CHALLENGE TO THE CHARACTERIZATION OF THE SALE PROCESS AS THE "GOLD STANDARD" ............................................................................................................................................. 10

5.  OBJECTION TO THE ASSERTION OF NON-RECEIPT OF ACTIONABLE BIDS AND CHALLENGE TO THE PROPRIETY OF THE ASSET DISPOSITION STRATEGY ............................... 11

6.  CHALLENGING THE CONFIRMATION ORDER: A FRAUDULENT MISREPRESENTATION CASE BASED ON *IN RE MELINTA THERAPEUTICS, INC.* CRITERIA" .................................................. 12

CONCLUSION ............................................................................................................................................. 13

**AUTHORITIES PRINCIPALLY RELIED UPON**

There are no statutes or rules primarily relied upon.  The Argument cites cases which are not supposed to be included in this section.

## JURISDICTIONAL STATEMENT

The United States Bankruptcy Court for the District of Delaware had jurisdiction over the bankruptcy case under 28 U.S.C. §§ 157 and 1334. This appeal is timely and this Court has jurisdiction under 28 U.S.C. § 158.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.  Whether the Bankruptcy Court erred in denying the motion for revocation of the confirmation order under section 1144 based on alleged fraud, specifically misrepresentation and lack of transparency regarding the valuation of the debtor's assets.

2.  Whether the determination of asset value through the sale process was conducted in a manner that improperly undervalued the assets, to the detriment of equity holders.

**STATEMENT OF THE CASE**

This appeal arises from the Bankruptcy Court's denial of a motion to revoke the confirmation order related to the Chapter 11 bankruptcy proceedings of Virgin Orbit LLC and its affiliates. The appellant, Dr. Tamas Hampel challenged the confirmation on grounds of alleged fraud, misrepresentation, and lack of transparency in the valuation and sale of the debtor's assets.

## STANDARD OF REVIEW

The standard of review for findings of fact by the bankruptcy court is clearly erroneous. Legal conclusions are reviewed de novo. The determination of whether the confirmation order was procured by fraud involves both factual findings and legal conclusions.

## ARGUMENTS

### 1. ARGUMENT REGARDING THE NON-APPLICATION OF RES JUDICATA TO THE NON-SALE OF INTELLECTUAL PROPERTY ASSETS

As a preliminary matter, it is important to clarify the scope and application of the doctrine of res judicata in the context of this appeal. The doctrine of res judicata, or claim preclusion, prevents parties from relitigating claims that were or could have been raised in a prior action, contingent upon a final judgment on the merits involving the same parties or their privies, and a subsequent suit based on the same cause of action (Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc.-Pension Fund v. Centra, 983 F.2d 495, 504 (3d Cir. 1992)).

The Appellant acknowledges the well-established principles underlying res judicata. However, the unique circumstances of this case necessitate a critical distinction. The core of the Appellant's challenge does not pertain to the sales process or the disposition of assets that were actively marketed and sold. Instead, the core of the Appellant's argument centers on the Debtors' decision not to sell significant intellectual property (IP) assets, but transfer to the majority at equity holder's expense, a decision that was not subject to direct objection or challenge at the time it was made.

The opportunity to object provided to parties in interest, naturally extends to concrete actions and decisions made by the Debtors, including the sale of assets. The Appellant was not intended to exercise, the right to object to the sale process as it unfolded. However, the absence of a sale—specifically, the decision not to market or sell the valuable IP assets—does not constitute an actionable event in the same manner. It is a non-action, an omission that falls outside the traditional bounds of what can be directly objected to or challenged within the framework of bankruptcy proceedings as they are typically understood.

Consequently, asserting that res judicata bars the Appellant from raising concerns related to the non-sale of IP assets misunderstands the essence of the doctrine and its applicability to the present situation. The Appellant could not have raised objections to the non-sale of the IP assets before those assets were excluded from the sales process—a decision encapsulated not by action, but by omission.

Therefore, the Appellant's challenge to the confirmation of the bankruptcy plan, inclusive of issues related to the non-sale of IP assets, does or seek to re-litigate claims previously adjudicated or that could have been adjudicated. Rather, it brings to light concerns inherently bound up with the overall strategy and decisions governing the bankruptcy proceedings, including decisions not to act, which were not and could not have been directly contested prior to the plan's confirmation.

**In light of these considerations, the Appellant respectfully submits that the doctrine of res judicata does not preclude this Court from examining the issues surrounding the non-sale of the IP assets, as these issues were not and could not have been part of any prior objection process concerning the sales conducted under the auspices of the Debtors' bankruptcy proceedings.**

2. **ARGUMENT REGARDING THE EXCLUSION OF EQUITY HOLDERS FROM THE BANKRUPTCY PROCEEDINGS**

The assertion by the Debtors that the Equity Holders were bound by the results of the bankruptcy proceedings due to their alleged failure to object or participate overlooks fundamental procedural and substantive rights violations experienced by the Equity Holders throughout the process. Despite being parties in interest under 11 U.S.C. § 1109(b), which affirms the right of equity security holders to raise, appear, and be heard on any issue in a case, the Equity Holders were systematically deprived of their rights to notification, participation, and transparent access to information, contrary to the procedural safeguards and equitable principles that underpin the Bankruptcy Code.

Firstly, during this accelerated but very complex fire sale and bankruptcy procedure the Equity Holders contend that they were not provided adequate notice of the bidding procedures. The transparency of the sale procedure is a fundamental procedural right that ensures all parties in interest are afforded the opportunity to participate meaningfully in the process. The lack of transparency effectively sidelined the Equity Holders, precluding them from exercising their rights to object or engage in the proceedings.

Moreover, the Equity Holders were denied the right to vote on the bankruptcy plan, a right that is pivotal to their interests and the bankruptcy process's integrity. The exclusion from voting not only diminishes the procedural equity of the proceedings but also substantively impacts the fairness and outcome of the bankruptcy resolution for Equity Holders. The sale process was conducted without transparency, with the Debtors and their advisors and agencies invoking confidentiality to deny the Equity Holders access to critical information regarding received bids. This opacity is antithetical to the principles of fairness and accountability that should characterize bankruptcy proceedings. The Equity Holders' inability to inquire into or challenge the terms and adequacy of the bids undermines the procedural and substantive integrity of the sale process and, by extension, the bankruptcy proceedings at large.

The cumulative effect of these procedural shortcomings and substantive rights violations renders the assertion that the Equity Holders are bound by the proceedings' results both legally untenable and fundamentally unjust. The exclusion from voting, participation, and denial of access to information contravene the statutory rights accorded to equity security holders under the Bankruptcy Code and the due process rights enshrined in the U.S. Constitution.

**In light of the foregoing, I respectfully request that this Court recognize the grave procedural and substantive injustices that have marred their participation in the bankruptcy process. I seek appropriate remedial action to rectify these injustices, including but not limited to, a reconsideration of their rights and interests in the context of the bankruptcy proceedings and the relief sought.**

3. **RESPONSE TO THE COURT'S CONCERN REGARDING THE INSUFFICIENCY OF EVIDENCE**

The Court's observation that the Equity Holders have not submitted evidence sufficient to demonstrate the material falsity of the Debtors' statements warrants a careful consideration of the circumstances surrounding the Equity Holders' ability to procure such evidence. It is essential to

9

underscore that the Equity Holders' capacity to gather evidence was significantly hampered by the lack of transparency that characterized the bankruptcy and sale procedures conducted by the Debtors.

Firstly, I contend that the cloudiness inherent in the Debtors' handling of the bankruptcy process severely limited their access to crucial information. The confidentiality invoked by the Debtors and their advisors regarding the sale process, including the details of bids received, effectively excluded the Equity Holders from obtaining the evidence necessary to substantiate their claims. This lack of transparency not only undermines the fairness and accountability expected in bankruptcy proceedings but also significantly impedes stakeholders' ability to challenge or verify the assertions made by the Debtors.

Furthermore, I wish to highlight that the burden of proof regarding the honesty and accuracy of the Debtors' statements inherently involves access to information that is exclusively within the control of the Debtors (Debtor in Possession). The Debtors' failure to provide a transparent process, thereby withholding information critical to the Equity Holders' ability to substantiate their claims, should not be construed as a deficiency on the part of the Equity Holders. Instead, it should be recognized as a manifestation of the Debtors' lack of candor and transparency.

Moreover, the Debtors' omission to counter the Equity Holders' statements, either through participation at the hearing at the Bankruptcy Court of Delaware dated 7th of March or by presenting evidence to challenge the Equity Holders' statements, further exacerbates the situation. The Debtors' absence of engagement in this context may be interpreted as an implicit acknowledgment of the difficulty in disputing the Equity Holders' claims under the cloak of confidentiality that they themselves have draped over the proceedings.

**Given these constraints, I respectfully request that the Court consider the broader context in which their efforts to procure and submit evidence have been undertaken. The fundamental issue at hand is not merely the insufficiency of evidence but the systemic lack of transparency and openness that has characterized the Debtors' conduct throughout the bankruptcy process. Such conduct not only hinders the ability of Equity Holders to substantiate their claims but also calls into question the integrity of the proceedings from a procedural justice standpoint.**

## 4. CHALLENGE TO THE CHARACTERIZATION OF THE SALE PROCESS AS THE "GOLD STANDARD"

The Court's characterization of the sale process as the "gold standard" for determining the value of the Debtors' assets, particularly in relation to the intellectual property (IP) assets associated with strategic national defense tool (Launcher One rocket design), necessitates a thorough reevaluation. It is imperative to underscore that the sale, as executed, deviates significantly from the principles that define an open, fair, and transparent market process, thereby undermining its designation as the "gold standard."

First and foremost, I assert that the process by which the IP assets were sold did not embody an open and transparent marketplace transaction. Instead, the sale was conducted in a manner that can be more accurately described as rushed and obscured, lacking the robustness and visibility requisite for a genuinely competitive and fair market environment. This deviation from transparency and openness is particularly critical given the strategic significance of the IP assets in question, which inherently demand a higher standard of care and diligence in their disposition.

Furthermore, the lack of adequate information provided to Equity Holders and other stakeholders concerning the sale process compounds the deficiencies of the transaction. The Equity Holders were not afforded the opportunity to understand fully or participate meaningfully in the process, a departure from the principles of equity and fairness that should underpin such significant transactions. The restricted flow of information regarding the valuation, marketing, and negotiation of the IP assets precluded a truly competitive bidding environment, essential for achieving a market-driven valuation.

Moreover, selling strategic national defense tools' IP assets under these conditions cannot be reconciled with the characterization of the sale as embodying the "gold standard." The expedited and less transparent nature of the sale, far from representing an exemplary market-driven transaction, reflects a process that likely did not capture the full potential value of these critical assets. Such circumstances raise substantial concerns about whether the transaction served the best interests of the Debtors and their stakeholders, including the Equity Holders.

**Given these considerations, I respectfully submit that the sale process, as it pertained to the strategic national defense tools' IP assets, falls short of the "gold standard" of asset valuation. I urge the Court to reconsider the characterization of the sale and to acknowledge the procedural and substantive shortcomings that have marred the process. Recognizing these deficiencies is paramount to ensuring that the equity and integrity of the bankruptcy proceedings are upheld, particularly in transactions involving assets of national strategic importance.**

5. **OBJECTION TO THE ASSERTION OF NON-RECEIPT OF ACTIONABLE BIDS AND CHALLENGE TO THE PROPRIETY OF THE ASSET DISPOSITION STRATEGY**

I hereby challenge the assertion that no actionable bids were received for the going-concern operation of Virgin Orbit Holdings Inc., as well as for the Remaining IP Assets. Contrary to the claims made in the bankruptcy proceedings, credible information indicates that as of May 4, 2023, Virgin Orbit Holdings Inc. was nearing a deal for a $200-million investment from Texas-based venture capital investor Matthew Brown. Furthermore, the Company had received over 30 indications of interest, including multiple parties proposing to continue to operate the business as a going concern and retain current employees in an integrated enterprise. **These revelations starkly contrast with the representation made to this Court and significantly undermine the rationale provided for the segmented sales strategy and the subsequent allocation of IP assets to Virgin Investments Limited (VIL), the Debtors' majority owner.**

The Equity Holders assert that the decision to disregard viable going-concern bids and to allocate core and highly valuable IP assets directly to VIL, without adequately considering the implications for operational continuity, employment preservation, and maximization of estate value, constitutes a failure to act in the best interests of the estate and its stakeholders. **This approach not only deprived the estate of potential value but also effectively transferred significant core assets to a related party under conditions that raise questions regarding the fairness and transparency of the process.**

The principles outlined in *In re Melinta Therapeutics, Inc.*, provide a pertinent framework for evaluating the actions of the Debtors in this context .Given the discrepancy between the information

presented to the Court and the facts indicating the presence of actionable going-concern bids, I respectfully request a thorough examination of the decision-making process that led to the segmented sales and the allocation of IP assets to VIL (majority owner, debtor in possession and secured creditor received the core assets by excluding other equity holders). The Equity Holders argue that this examination is essential to ascertain whether materially false representations were made to the Court regarding the viability of maintaining the Company as an ongoing concern and the true value of the IP assets.

**Therefore, I respectfully urge the Court to reconsider the propriety of the confirmation order in light of the potential for materially false representations to have influenced the Court's decision-making. I seek relief that ensures the integrity of the bankruptcy process is upheld, and that any actions taken based on potentially false premises are subject to appropriate scrutiny and correction.**

## 6. CHALLENGING THE CONFIRMATION ORDER: A FRAUDULENT MISREPRESENTATION CASE BASED ON *IN RE MELINTA THERAPEUTICS, INC.* CRITERIA"

To contest the validity of the confirmation order on the grounds of fraud, as it pertains to the allocation of Virgin Orbit Holdings Inc.'s assets, including its IP assets, I draw upon the criteria established in *In re Melinta Therapeutics, Inc.* A structured demonstration of each element is necessary to articulate our position:

- **False Representation Regarding Compliance with Bankruptcy Code Section 1129**: The Debtors represented to the Court that no actionable bids were received for the company as a going concern or for its Remaining IP Assets, implying compliance with the requisite due diligence and maximization of asset value under Code § 1129. This representation was materially false. Official statement suggests that as of May 4, 2023, there were over 30 indications of interest, including serious considerations for continuing the business's operation, contrary to the Debtors' claims.
- **Knowledge or Reckless Disregard for the Truth**: The Debtors, aware of or recklessly disregarding the truth, made these representations. The substantial interest from multiple parties to operate the business as a going concern highlight that the Debtors were, at minimum, in reckless disregard of the material facts at their disposal.
- **Inducement to Rely**: The representations were crafted to induce the Court's reliance, steering the proceedings towards a segmented sale and the advantageous allocation of IP assets to VIL, the majority owner. This strategic presentation was designed to shape the Court's perception and decisions regarding the feasibility of preserving the company's operational integrity and the disposition of its assets.
- **Court's Reliance**: The Court, relying on the Debtors' representations, sanctioned the segmented sales process and approved the allocation of IP assets in a manner that was ostensibly compliant with the Bankruptcy Code but fundamentally at odds with the available evidence indicating viable alternatives for going-concern operations.

- **Consequences of the Court's Reliance**: As a direct consequence of the Court's reliance on these materially false representations, the confirmation order was entered, legitimizing the segmented sale and the transfer of valuable IP assets to VIL under conditions that did not

reflect the best possible outcome for the Debtors or their stakeholders, particularly the Equity Holders.

Given this structured demonstration based on the *In re Melinta Therapeutics, Inc.* criteria, I argue that the confirmation order was procured under pretenses that materially misrepresented the reality of the Debtors' situation and their assets' market interest. Such misrepresentation and the Court's reliance thereupon demand a critical reevaluation of the confirmation order to ensure the integrity of the bankruptcy process and the equitable treatment of all parties, especially in light of the strategic national defense implications tied to the Debtors' IP assets.

## CONCLUSION

For the foregoing reasons, the Appellant respectfully requests that this Court reverse the Bankruptcy Court's decision and remand the case with instructions to reconsider the motion for revocation of the confirmation order, taking into account the arguments and evidences of undervaluation and misrepresentation.

Respectfully submitted at Wilmington, Delaware

Dr. Tamas Hampel
1125 Budapest, Dios arok 49d
tamas.hampel@gmail.com
+36 20 390 20 90



13

## IN THE UNITED STATES COURT FOR THE DISTRICT OF DELAWARE

| | | | |
|---|---|---|---|
| DR. TAMAS HAMPEL | ) | | |
| | ) | | |
| vs. | ) | Chapter 11 | |
| | ) | | |
| VIRGIN ORBIT, LLC,[1] | ) | Case No. 23-10408 (KBO) | |
| | ) | | |

[1] The debtor in this case, along with the last four digits of the debtor's federal tax identification number, is: Virgin Orbit, LLC (9648). The debtor's mailing address for purposes of this case is 251 Little Falls Drive, Wilmington, DE 19808. The chapter 11 cases of the debtor's affiliates, Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit Holdings, Inc. (6914); and JACM Holdings, Inc. (1445), were closed as of December 1, 2023. All motions and contested matters that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of Virgin Orbit, LLC.

## Case No. 23-10408 (KBO)

### RECORD ON APPEAL

### Notice of Appeal

Filed on 12 March 2024, signaling the commencement of the appeal process.

### Docket Sheet

A comprehensive list of all filings, motions, orders, and other procedural steps taken in the lower court, providing a procedural history of the case.

1.  **Motions and Responses**

**No 17**. Objection to Confirmation of Plan Filed by Tamas Hampel 12/27/2023

**No 19**. Declaration in Support of Objection (related document(s)17) To The Order Confirming The Fifth Amended Joint Chapter 11 Plan of Virgin Orbit Holdings, Inc. And Its Debtor Affiliates, Order Signed on 7/31/23 Docket No. 604; 23-10405 Filed by Tamas Hampel dated 01/04/2024

**No 25**. Supplemental Declaration in Support of Objection To The Order Confirming The Fifth Amended Joint Chapter 11 Plan of Virgin Orbit Holdings, Inc. and Its Debtor Affiliates (related document(s)17, 19) Filed by Tamas Hampel dated 01/10/2024

**No 30.** Response - Debtors' Response to Objection of Tamas Hampel to the Order Confirming the Fifth Amended Joint Chapter 11 Plan of Virgin Orbit Holdings, Inc. and Its Debtor Affiliates (related document(s)17, 19, 25) Filed by Virgin Orbit, LLC dated 01/23/2024

**No 47. and No 764.** Supplemental Declarations in Support of the Objection of Tamas Hampel. Filed by Tamas Hampel dated 02/05/2024

**Hearings**

No 44. PDF with attached Audio File. Court Date & Time (02/01/2024 09:07:30 AM). File Size ( 5738 KB ). Run Time ( 00:12:14 )

No 48. PDF with attached Audio File. Court Date & Time (02/06/2024 08:26:20 AM). File Size ( 14246 KB ). Run Time ( 00:30:23 )

No 52 PDF with attached Audio File. Court Date & Time (02/07/2024 09:20:37 AM). File Size ( 37835 KB ). Run Time ( 01:20:42 ).

**Exhibits**

Exhibit A:
https://web.archive.org/web/20230526202543mp_/https://www.virginorbitns.com/press/2021/11/23/vox-statement-on-the-russian-federation-antisatellite-test